# EXHIBIT A

PAUL E. KNISELY
pek@knp-law.com

TOM PREHODITCH
tpp@knp-law.com

ATTORNEYS AT LAW
9020 CAPITAL OF TEXAS HWY. N
BLDG I, SUITE 300
AUSTIN, TEXAS 78759
OFFICE: (512) 338-8800
FAX:    (512) 338-8806
www.kpp-law.com

JASON PANZER
jpanzer@knp-law.com

**ASSOCIATE**

VICKIE PREHODITCH
vp@knp-law.com

November 28, 2011

Mr. Gary N. Schumann
Ms. Jessica Marcoux Hall
Savrick, Schumann, Johnson,
    McGarr, Kaminski & Shirley, LLP
The Overlook at Gaines Ranch
4330 Gaines Ranch Loop, Ste. 150
Austin, Texas 78735

> Re:    *Indian Harbor Insurance Company v. KB Lone Star, Inc.,* Civil Action No. 4:11-
> cv-1846; In the United States District Court for the Southern District of Texas,
> Houston Division ("Declaratory Judgment Action").

Dear Mr. Schumann and Ms. Hall:

You have retained me to provide expert testimony in the above-referenced matter on the issues of (1) whether the law firm of Langley & Banack, Inc. ("Langley & Banack") engaged in a conflict of interest and/or breached fiduciary duties with respect to its client, Innovative Concrete Construction, Inc. ("Innovative Concrete"), and to Innovative Concrete's insurer, Indian Harbor Insurance Company ("Indian Harbor"), by representing parties adverse to Innovative Concrete in other lawsuits; and (2) whether, in my opinion, any such conflicts of interest and/or breaches of fiduciary duty nullify or void any claim to attorneys' fees that Langley & Banack might otherwise have on Innovative Concrete's liability insurance policy with Indian Harbor as a result of its representation of the other parties in the other lawsuits.

My relevant background is as follows: I am an attorney and was licensed to practice law in Texas by the State Bar of Texas in 1991. I am a shareholder in the Austin law firm of Knisely, Prehoditch, & Panzer, P.C. and have been a shareholder of this law firm and its predecessor since 1997. Before that, I was an associate at the Austin law firm of Spivey, Grigg, Kelly & Knisely from the time I was licensed in 1991 until 1997 when Paul Knisely and I formed our current firm. I received a B.A. from the University of Texas at Arlington in 1973, a law degree from the University of Texas School of Law in 1991, and an M.A. and a Ph.D. in political science from the University of Oregon in, respectively, 1977 and 1985.

I am a member of the State Bar of Texas, the Austin Bar Association, the Texas Bar Foundation, and the Texas Trial Lawyers Association. I am licensed to practice before the United States District Courts for the Northern, Southern, Western, and Eastern Districts of Texas.

I began working on legal malpractice cases before I was licensed to practice law, as a law clerk for two years from 1989-1991 with Broadus Spivey and Paul Knisely, with whom I continued to work on such cases after I was licensed to practice law in 1991. Both at my former law firm of Spivey, Grigg, Kelly & Knisely and my current law firm, the vast majority of my practice has been in representing clients in the area of legal malpractice, with a particular emphasis on claims involving breaches of fiduciary duty, conflicts of interest, excessive or unreasonable fee claims, and negligence. Throughout my legal career, I have been involved in pursuing numerous such claims against, among others, some of the largest and most established firms in Texas and in the United States. Many of these claims have arisen in very complex underlying transactional or litigation settings including, among others, intellectual property litigation, patent prosecution, bankruptcy proceedings, disputes over natural resources, real estate transactions, estate and probate matters, commercial disputes, family law disputes, personal injury lawsuits, as well as other subject matters. I estimate that since 1995 members of my firm and I have been involved in handling 25-50 claims alleging conflicts of interest and breaches of fiduciary duties against attorneys, some of which have also involved allegations of unreasonable and excessive attorneys' fees. Some of these claims are reported in appellate opinions, many others were fully prosecuted as lawsuits before they were resolved, and others involved pre-litigation settlement negotiations and/or mediation. I have also consulted with or represented attorneys regarding conflict of interest and breach of fiduciary duty issues on several occasions.

My professional information is attached as Exhibit "A."

I have considered certain facts and circumstances, as well as relevant Texas law governing the conduct of lawyers in forming the opinions that are expressed below:

## I. APPLICABLE FACTS AND CIRCUMSTANCES

### A. LANGLEY & BANACK'S ROLE IN THE WINSTEAD LAWSUIT AND THE INNOVATIVE CONRETE BANKRUPTCY PROCEEDING

1. I have reviewed what I understand to be the court file and docket sheet in the lawsuit styled as *Duane Winstead and Norajill Winstead vs. KB Home Lone Star, L.P.*, Cause No. 02-388, in the 216th District Court of Kendall County, Texas ("Winstead Lawsuit"). I have also reviewed several documents from a Chapter 7 bankruptcy proceeding in which Innovative Concrete was the debtor, which is styled as *In re: Innovative Concrete Construction, Inc., Debtor,* U.S. Bankruptcy Court for the Western District of Texas, San Antonio Division, Case No. 04-56496-RBK-7, Chapter 7 ("Innovative Concrete Bankruptcy Proceeding"), including the docket sheet, as well as, among other documents, the following: the Voluntary Petition commencing the bankruptcy proceeding, the Statement of Financial Affairs of Innovative Concrete, and the Amended Statement of Financial Affairs of Innovative Concrete.

2. In November 2002, the plaintiffs in the Winstead Lawsuit sued KB Home Lone Star, L.P. for defects in the construction of their residential home, principally related to foundation work at the plaintiffs' residence. KB Home Lone Star, L.P. was the

builder and contractor of the home in question. KB Home Lone Star, L.P. answered that lawsuit in December 2002.

3. In May 2003, defendant KB Home Lone Star, L.P. filed a motion for leave to file a joinder of responsible third party (i.e. third-party claims) against both Victor Seguin and S.A. Engineering Company in the Winstead Lawsuit, and, by subsequent order, the court granted that motion.

4. In April 2004, third-party defendant S.A. Engineering Company filed an unopposed motion for leave to file joinder of responsible third party and third-party complaint against Innovative Concrete in the Winstead Lawsuit, and, by subsequent order, the court granted that motion. In S.A. Engineering's joinder of responsible third party and third-party complaint against Innovative Concrete filed in May 2004, S.A. Engineering alleged that the defect in the residence of which the plaintiffs complained was caused, in whole or part, by the conduct of Innovative Concrete, as the concrete subcontractor for the construction of the foundation and/or slab at the plaintiffs' residence in question.

5. In August 2004, third-party defendant Innovative Concrete's original answer was filed in the Winstead Lawsuit. This pleading was filed on behalf of Innovative Concrete by William R. Davis, Jr. of Langley & Banack.

6. According to the Langley & Banack website as of the date of this letter, William R. Davis, Jr. continues to practice law at Langley & Banack, where he is presently a shareholder.

7. In November 2004, Mr. Davis filed a suggestion of bankruptcy on Innovative Concrete's behalf in the Winstead Lawsuit.

8. In the Winstead Lawsuit, in some of the documents filed with the court, attorney Michael Boyle of Langley & Banack is also listed as counsel of record for Innovative Concrete.

9. According to the Langley & Banack website as of the date of this letter, Michael Boyle continues to practice law at Langley & Banack, where he is presently a shareholder.

10. One of the documents that appears in the Winstead Lawsuit court file is a notice of intention to take depositions by written questions filed by S.A. Engineering's counsel in November 2004 and served on Michael Boyle of Langley & Banack as Innovative Concrete's counsel, requesting any and all insurance records of Indian Harbor relating to Innovative Concrete.

11. In December 2004, counsel for S.A. Engineering filed, in the Innovative Concrete Bankruptcy Proceeding, a motion for relief from the automatic stay in which it was stated that based on available information, the claims against Innovative Concrete in

the Winstead Lawsuit "are covered by a liability insurance policy purchased by [Innovative Concrete] from Indian Harbor Insurance Company and said insurance policy was in full force and effect at the time of the incident make the basis of said lawsuit."

12. In January 2005, third-party defendant S.A. Engineering Company filed a notice of filing order lifting the bankruptcy stay in the Winstead Lawsuit, attached to which is an order lifting the automatic stay signed by the bankruptcy judge in the Innovative Concrete Bankruptcy Proceeding. That order states that the "Automatic Stay . . . is hereby lifted to allow all parties to proceed through all appeals in the [Winstead Lawsuit] against the Debtor . . . and to allow all parties to recover from Debtor's applicable insurance and to file a proof of claim for any remaining claims."

13. In February 2005, defendant KB Home Lone Star, L.P. filed an original cross-claim in the Winstead Lawsuit against Innovative Concrete, as the entity that had constructed the foundation of the plaintiffs' home, seeking contribution and contractual indemnity from Innovative Concrete in the event that KB Home Lone Star, L.P. was found to be liable to the plaintiffs in that lawsuit. This pleading was served on Innovative Concrete's attorney of record, William R. Davis, Jr. of Langley & Banack.

14. The deposition of the principal shareholder and President of Innovative Concrete, Wayne Champagne, was taken in the Winstead Lawsuit in February 2005. Court documents reflect that Mr. Davis of Langley & Banack attended that deposition as the "attorney for the witness," and presumably as the attorney for Innovative Concrete as well.

15. In August 2005, the Winstead plaintiffs filed a motion to dismiss their claims against KB Home Lone Star, L.P. with prejudice in the Winstead Lawsuit, and that motion was subsequently granted by order of the court later that month.

16. In late August 2005, KB Home Lone Star, L.P. filed a motion to dismiss its claims against S.A. Engineering Company and Victor Seguin with prejudice in the Winstead Lawsuit, and that motion was subsequently granted by order of the court later that month. That order also reflects that nothing in the order disposed of or affected KB Home Lone Star, L.P.'s claims against Innovative Concrete.

17. The Winstead Lawsuit was dismissed for want of prosecution in July 2009. A copy of the notice setting a dismissal hearing in July 2009 and stating that the Winstead Lawsuit would be dismissed for want of prosecution unless good cause could be shown to maintain the case on the docket was sent by the Kendall County deputy clerk to Mr. Davis of Langley & Banack on June 5, 2009. The order dismissing the Winstead Lawsuit was signed and entered on July 10, 2009, and sent to Mr. Davis on July 13, 2009.

18. There is no indication in the Winstead Lawsuit court documents that Mr. Davis ever withdrew as counsel for Innovative County in that lawsuit.

19. William R. Davis of Langley & Banack also represented Innovative Concrete in the Innovative's Concrete Bankruptcy Proceeding. Mr. Davis signed and filed Innovative Concrete's Voluntary Petition under chapter 7 on November 10, 2004, in the United States Bankruptcy Court for the Western District of Texas, San Antonio Division. The bankruptcy proceeding was closed and terminated in March 2006. Mr. Davis and Langley & Banack appear to have represented Innovative Concrete throughout the bankruptcy proceeding.

20. The plaintiffs in the Winstead Lawsuit are listed as creditors in Innovative Concrete's Voluntary Petition in the Innovative Concrete Bankruptcy Proceeding, as is KB Home Lone Star, L.P. (based on a pending lawsuit that appears to be the Winstead Lawsuit) and KB Home (based on notice having been given of a claim).

21. The Winstead Lawsuit is listed in Innovative Concrete's Statement of Financial Affairs and its Amended Statement of Financial Affairs in the Innovative Concrete Bankruptcy Proceeding as a lawsuit pending against Innovative Concrete.

22. Langley & Banack is listed in Innovative Concrete's Amended Statement of Financial Affairs in the Innovative Concrete Bankruptcy Proceeding as having been paid $5,000.00 for legal services and filing fees on behalf of Innovative Concrete related to debt counseling or the bankruptcy proceeding.

23. I have not reviewed Langley & Banack's file relating to its representation of Innovative Concrete in the Winstead Lawsuit. It is my understanding that such file has not been produced.

## B. LANGLEY & BANACK'S ROLE IN THE ARIAS AND SAHA LAWSUITS

24. Two other Langley & Banack attorneys, Roger D. Kirstein and Stephen E. Walraven, represented various KB entities, including KB Home Lone Star, L.P., in two residential construction defect lawsuits filed in San Antonio, Bexar County, Texas, each relating to a government-subsidized residential housing development in San Antonio commonly called the "Mirasol project." These lawsuits were originally styled as: *San Antonio Housing Authority v. Magi Realty, Inc., dba Mirasol Joint Venture Team v. KB Home Lone Star, L.P. f/k/a Kaufman & Broad Lone Star, L.P.*, No. 2007-CI-05258, in the 408th District Court of Bexar County, Texas ("SAHA Lawsuit"), which was commenced in April 2007; and *Jesse Arias et al. v. KB Home et al.*, No. 2009-CI-08711, in the 288th District Court of Bexar County, Texas ("Arias Lawsuit"), which was commenced in May 2009. In January 2010, by order of the Honorable David Berchelmann, the SAHA Lawsuit was transferred to the 37th District Court of Bexar County and consolidated into the Arias Lawsuit. The consolidated lawsuit was then styled as *Arias et al. v KB Home et al.*, Cause No. 2009-CI-08711, in the 37th District Court of Bexar County, Texas ("Consolidated

Lawsuit"). Mr. Kirstein and Mr. Walraven continued to represent KB Home Lone Star, L.P. and other KB entities in the Consolidated Lawsuit. I have reviewed various pleadings from each of the lawsuits described in this paragraph.

25. According to the Langley & Banack website as of the date of this letter, Roger D. Kirstein and Stephen E. Walraven continue to practice law at Langley & Banack, where they are both shareholders.

26. In April 2007, in the SAHA Lawsuit, the plaintiff San Antonio Housing Authority ("SAHA") sued MAGI Realty, Inc. d/b/a/Mirasol Joint Venture Team ("MAGI") for breach of contract, and requested depositions pursuant to Texas Rule of Civil Procedure 202 in order to conduct investigatory depositions to investigate additional causes of action by SAHA.

27. In May 2007, MAGI filed an original answer in the SAHA Lawsuit, and further filed a third-party petition against KB Home Lone Star, L.P., alleging that KB Home Lone Star, L.P., as contractor of the homes in question, was required to indemnify MAGI from any and all claims made by the plaintiff in the SAHA lawsuit.

28. In June 2007, in the SAHA Lawsuit, Roger D. Kirstein of Langley & Banack filed an original answer on behalf of KB Home Lone Star, L.P. to the third-party petition filed against it by MAGI.

29. In August 2007, KB's Homes' senior regional counsel wrote a letter to Wayne Champagne of Innovative Homes that in the SAHA Lawsuit, SAHA had put KB Home Lone Star, L.P. on notice of construction defects relating to homes in the Mirasol project, including foundation and/or slab defects for which Innovative Concrete was the subcontractor. The letter also put Innovative Concrete and its insurers on notice that KB Home Lone Star, L.P. intended to pursue all available remedies against Innovative Concrete. (*See* August 28, 2007 correspondence from Travis W. Cope attached as a portion of Exhibit C to Defendants' Motion for Abstention and Request for Hearing filed in the Declaratory Judgment Action on November 7, 2011.)

30. In October 2007, Mr. Kirstein, on behalf of KB Home Lone Star, L.P., filed a motion in the SAHA Lawsuit seeking leave of court to file a third-party petition against various parties, and that motion was subsequently granted. Mr. Kirstein filed KB Home Lone Star, L.P.'s first third-party petition in October 2007.

31. In November 2007, Mr. Kirstein, on behalf of KB Home Lone Star, L.P., filed a second motion in the SAHA Lawsuit seeking leave of court to file an amended third-party petition against various parties, including Innovative Concrete, and that motion was subsequently granted in December 2007.

32. In December 2007, Mr. Kirstein of Langley & Banack, on behalf of KB Home Lone Star, L.P., filed an amended third-party petition against various parties in the SAHA

Lawsuit, including Innovative Concrete, seeking indemnification and contribution from its various subcontractors for MAGI's claims against it, noting that MAGI was in turn seeking indemnification from KB Home Lone Star, L.P. for SAHA's claims against MAGI. In its amended third-party petition, KB Home Lone Star, L.P. also sought its attorneys' fees from its subcontractors, including Innovative Concrete.

33. SAHA's pleadings in the SAHA Lawsuit demonstrate that among the residential construction defects about which SAHA was complaining were those related to foundation work at the various residences at issue in that lawsuit. It is unclear from these pleadings alone precisely what claims are made against Innovative Concrete, but for clarification see paragraphs 29 and 32 above and paragraphs 38 and 39 below, as well as correspondence attached as Exhibit C to Defendants' Motion for Abstention and Request for Hearing filed in the Declaratory Judgment Action on November 7, 2011.

34. In the Arias Lawsuit, the plaintiffs filed their original petition in May 2009 against various defendants, including KB Home Lone Star, Inc., as the successor to KB Home Lone Star, L.P. f/k/a Kaufman & Broad Lone Star LP, the builder and contractor of the homes in question, alleging, among other things, that some of the foundations of the residences in question were improperly constructed and that some of the foundations were not level. (In later pleadings of the plaintiffs, KB Home Lone Star, Inc. is treated as a separate entity and separate defendant from KB Home Lone Star, L.P. f/k/a Kaufman and Broad Lone Star LP.) It is unclear from this pleading and others subsequently filed by the plaintiffs precisely what claims are made against Innovative Concrete, but for clarification see paragraphs 35, 36, 38, and 39 below, as well as correspondence attached as Exhibit C to Defendants' Motion for Abstention and Request for Hearing filed in the Declaratory Judgment Action on November 7, 2011.

35. In September 2009, Erik D. Buzzard of the law firm of Palumbo Bergstrom, as counsel for "KB Home, Inc., and its related and affiliated entities," wrote Indian Harbor, among other insurers, and noted that with respect to the Arias Lawsuit, 46 of the 50 homes at issue in that lawsuit were previously involved in the SAHA Lawsuit and that the two lawsuits alleged the exact same claims. (*See* September 8, 2009 correspondence from Erik D. Buzzard attached as a portion of Exhibit C to Defendants' Motion for Abstention and Request for Hearing filed in the Declaratory Judgment Action on November 7, 2011.)

36. In November 2009, Mr. Kirstein and Mr. Walraven filed an amended third-party petition in the Arias Lawsuit in which various KB entities, including KB Home Lone Star, Inc., sued various third-party defendants as "subcontractor defendants," including Innovative Concrete, for breach of contract, indemnity and contribution, and negligence related to the Arias plaintiffs' claims, and for attorneys' fees.

37. After the SAHA Lawsuit and the Arias Lawsuit were consolidated into the Consolidated Lawsuit, SAHA and the Arias plaintiffs continued to file amended

pleadings alleging essentially the same residential construction defect claims as they had before the consolidation. These pleadings included SAHA's Ninth Amended Petition and First Amended Counterclaim filed in February 2011 and the Arias Plaintiffs' Eighth Amended Petition also filed in February 2011.

38. Mr. Kirstein and Mr. Walraven continued to file third-party petitions on KB Home Lone Star, L.P.'s behalf in the Consolidated Lawsuit, and continued to sue Innovative Concrete as a third-party defendant in the Consolidated Lawsuit. These filings included KB Home Lone Star, L.P.'s Twelfth Amended Third Party Petition filed in January 2011. In that pleading, Mr. Kirstein and Mr. Walraven alleged that some of the defects that SAHA was alleging were a result of negligence included the claims that some of the foundations of the residences in question were improperly constructed and some foundations were not level. Mr. Kirstein and Mr. Walraven, on KB Home Lone Star's behalf, thus continued to sue Innovative Concrete, among others, for breach of contract, indemnity and contribution, and negligence related to the plaintiffs' claims, and for attorneys' fees.

39. In January 2011, Mr. Kirstein and Mr. Walraven filed a second amended third-party petition in the Consolidated Lawsuit in which various KB entities, including KB Home Lone Star, Inc., continued to sue various third-party defendants as "subcontractor defendants," including Innovative Concrete, for breach of contract, indemnity and contribution, and negligence related to the plaintiff's claims, and for attorneys' fees. In that pleading, Mr. Kirstein and Mr. Walraven alleged that some of the defects that the plaintiffs were alleging included the claims that some of the foundations of the residences in question were improperly constructed and some foundations were not level.

40. In the SAHA Lawsuit, the Arias Lawsuit, and the Consolidated Lawsuit, Mr. Kirstein and/or Mr. Walraven of Langley & Banack filed third party petitions on behalf of KB Home Lone Star, L.P. and/or its related or affiliated entity, KB Home Lone Star, Inc., in which they stated that these KB Home entities sought insurance proceeds from the various third-party defendant subcontractors, including Innovative Concrete. *See* the pleadings referenced in paragraphs 32, 36, 38, and 39 above. Since at least late 2004, Langley & Banack had been put on constructive notice that Innovative Concrete apparently had a liability policy with Indian Harbor. And at least Mr. Kirstein was on actual notice of this fact since 2007. *See* paragraphs 11 and 12 above and paragraph 46 below.

## C. THE DECLARATORY JUDGMENT ACTION:

41. Indian Harbor issued a commercial general liability insurance policy to Innovative Concrete, policy number AIL 022000044, covering the policy period from October 18, 2000 to October 18, 2001 ("CGL Policy").

42. Beginning in 2007, pursuant to a subcontract with Innovative Concrete, "KB Home Lone Star, Inc. f/k/a KB Home Lone Star, L.P. f/k/a Kaufman & Broad Lone Star,

L.P." claimed "additional insured" status under a blanket additional insured endorsement to the CGL Policy for the purpose of obtaining defense costs (i.e. Langley & Banack attorneys' fees) and indemnity from Indian Harbor regarding the claims in the SAHA Lawsuit. (*See* correspondence attached as a portion of Exhibit C to Defendants' Motion for Abstention and Request for Hearing filed in the Declaratory Judgment Action on November 7, 2011.)

43. Later, in May 2009, the law firm of Palumbo Bergstrom stated that it had been retained as co-counsel for "KB Home, Inc." for the purpose of handling additional insured issues with respect to the SAHA Lawsuit. (*See* May 21, 2009 correspondence from Eric D. Buzzard attached as a portion of Exhibit C to Defendants' Motion for Abstention and Request for Hearing filed in the Declaratory Judgment Action on November 7, 2011.)

44. Also, in June 2009, Palumbo Bergstrom stated that it had been retained to represent "KB Home and its related and affiliated entities ('KB')" and also that its client was "KB Home Lone Star, L.P. f/k/a Kaufman & Broad Lone Star, L.P." for the purpose of handling additional insured issues with respect to the Arias Lawsuit and for the purpose of obtaining defense costs (i.e. Langley & Banack attorneys' fees) and indemnity from Indian Harbor regarding the claims in the Arias Lawsuit. (*See* June 17, 2009 correspondence from Eric D. Buzzard attached as a portion of Exhibit C to Defendants' Motion for Abstention and Request for Hearing filed in the Declaratory Judgment Action on November 7, 2011.)

45. In the Declaratory Judgment Action, Palumbo Bergstrom, as opposing counsel to Indian Harbor, sometimes refers to its client as "Defendant KB Home, Inc., also known as KB Home; KB Home Lone Star, Inc.; KB Home of San Antonio; and KB Home Lone Star, LP." (*See, for example*, Defendant's Certificate of Disclosure of Interested Parties filed on August 31, 2011). At times, Palumbo Bergstrom also says that it represents KB Home Lone Star, Inc., KB Home Lone Star, L.P., KB Lone Star, Inc., Lone Star, L.P., and Kaufman & Broad Lone Star, L.P. (collectively "KB") (*See, for example*, Defendants' Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(B)(7)) filed on June 7, 2011.) However, whatever the proper names are of the entity or entities Palumbo Bergstrom's represents in the Declaratory Judgment Action, they are treated by their counsel as either one and the same entity, as an alter ego of one another, or at least as related and affiliated entities. (On this point, *see* paragraph 44 above and *see also* Defendant KB Home Lone Star's Initial Disclosures served on opposing counsel on August 26, 2011 in which Roger D. Kirstein of Langley & Banack is listed as a witness or individual likely to have discoverable information as follows: "Mr. Kirstein is counsel for KB in the underlying [SAHA Lawsuit and Arias Lawsuit] actions.")

46. Mr. Kirstein of Langley & Banack became involved at least as early as October 2007 in assisting KB Home Lone Star, L.P. in asserting its claim as an additional insured under Innovative Concrete's CGL policy with Indian Harbor, and his involvement on this issue continued thereafter. (*See* correspondence attached to Exhibit C to

Defendants' Motion for Abstention and Request for Hearing filed in the Declaratory Judgment Action on November 7, 2011.)

## II.   TEXAS AND FEDERAL LAW GOVERNING CONFLICTS OF INTEREST AND BREACHES OF FIDUCIARY DUTY OF ATTORNEYS IN TEXAS

Texas and federal law, including the following law governing the conduct of lawyers with respect to conflicts of interests and breaches of fiduciary duties, as well as relevant Texas Disciplinary Rules of Professional Conduct and comments thereto, are pertinent to my opinions:

### A. TEXAS AND FEDERAL LAW GOVERNING BREACHES OF FIDUCIARY DUTIES BY ATTORNEYS

Claims for breach of fiduciary duties against attorneys differ from professional negligence claims in that the former deal with a breach of a standard of ethical conduct, while the latter deal with the breach of a standard of care. The Texas Supreme Court has made it clear in numerous cases that lawyers in Texas owe a fiduciary duty to their clients and that this duty is among the highest under Texas law. For example, the Court has said that "in Texas, we hold attorneys to the highest standards of ethical conduct in their dealings with their clients. The duty is highest when the attorney contracts with his or her client or otherwise takes a position adverse to his or her client's interest. As Justice Cardozo observed a '[a fiduciary] is held to something stricter than the morals of the marketplace. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.' Accordingly a lawyer **must conduct his or her business with inveterate honesty and loyalty, always keeping the client's best interest in mind.**" *Hoover v. Slovacek LLP v. Walton,* 206 S.W.3d 557, 560-61 (Tex. 2006) (citing *Lopez v. Munoz, Hockema & Reed, L.L.P.,* 22 S.W.3d 857, 868 (Tex. 2000) (emphasis added). Further, the fiduciary duty that an attorney owes a client is one of "most abundant good faith," requiring absolute and perfect candor, openness, and honesty, and the absence of any concealment or deception. *Goffney v. Rabson,* 56 S.W.3d 186, 193 (Tex. App.--Houston [14th Dist.] 2001, pet. denied); *Perez v. Kirk & Carrigan,* 822 S.W.2d 261, 263-66 (Tex. App.--Corpus Christi 1991, writ denied). Breaches of fiduciary duty by an attorney most often involve situations in which an attorney fails to disclose conflicts of interest to a client, engages in self-dealing, deception, or misrepresentations, fails to deliver funds belonging to a client to the client, places the attorney's interests above the interests of the client, or violates the confidences of a client. *Goffney,* 56 S.W.3d at 193. For further discussion of the fiduciary duty Texas attorneys owe their clients and the situations in which such a duty can arise, *see also Jackson Law Office, P.C. v. Chappell,* 37 S.W.3d 15, 22-23 (Tex. App.--Tyler 2000, pet. denied); *Floyd v. Hefner,* 556 F.Supp.2d 617, 661-664 (S.D. Tex. 2008).

Cases in which factfinders have found that lawyers engaged in impermissible conflicts of interest, and/or failed to disclose such conflicts or, alternatively, where appellate courts have found that a trial court's summary judgment in favor of attorneys was precluded on such claims, include: *Burrow v. Arce,* 997 S.W.2d 229 (Tex 1999) (determining that fee forfeiture is an available remedy in Texas when attorneys have breached fiduciary duties to their clients, and

remanding to the trial court for a determination of whether forfeiture of attorneys' fees was an available remedy where attorneys were accused by their former clients of, among other allegations, intimidating and coercing their clients into accepting settlements on which the attorneys had a contingency fee claim); *Deutsch v. Hoover, Bax & Slovacek, L.L.P.,* 97 S.W.3d 179, 191-194 (Tex. App.–Houston [14th Dist.] 2003, no pet.) (evidence that law firm breached its fiduciary duties by allegedly failing to advise client concerning conflicts of interest and failing to withdraw because of the alleged conflicts raised a fact issue on client's fee forfeiture claim, precluding directed verdict); *Vinson & Elkins v. Moran,* 946 S.W.2d 381, 411-13 (Tex. App.- -Houston [14th Dist.] 1997, writ dism'd by agr.) (evidence of law firm's multiple conflicts of interest that were not disclosed to its clients, and evidence that the law firm placed its own interests above those of its clients, supported a jury verdict finding that the firm had breached its fiduciary duty to its clients); *In re Legal Econometrics, Inc.* 191 B.R. 331, 344-45, 348 (Bankr. N.D. Texas 1995), *affirmed in part, remanded in part, modified in part,* 1997 WL 560617 (N.D. Tex. 1997), *affirmed after remand,* 1999 WL 304564 (N.D. Tex. 1999), *appeal dism'd by agr.* (bankruptcy court finding, upheld by federal district court, that law firm and lawyers were not acting solely in the interest of their client in a corporate reorganization scheme, but rather on behalf of a third party who was also their client, that this was a direct conflict of interest that was not properly disclosed, and that the consequence of the law firm's actions was to give the third party control and ownership over the client's property to which the third party was not entitled, constituted breaches of fiduciary duty by the law firm and lawyers); *Perez,* 822 S.W.2d at 263-66 (evidence that employer's attorney also represented employee precluded summary judgment on latter's claim for breach of fiduciary duty when attorneys disclosed employee's privileged statements to district attorney); *Avila v. Havana Painting Co., Inc.*, 761 S.W.2d 398, 399-400 (Tex. App.--Houston [14th Dist.] 1988, writ denied) (attorney's failure to turn over settlement proceeds received on behalf of his client supported breach of fiduciary duty claim); *Bryant v. Lewis*, 27 S.W.2d 604 (Tex. Civ. App.–Austin 1930, *writ dism'd w.o.j.*) (conflict of interest found in the representation of competing heirs).

## B.  TEXAS DISCIPLINARY RULES OF PROFESSIONAL CONDUCT

Although the Texas Disciplinary Rules of Professional Conduct are not dispositive, they are considered by courts as evidence and significantly inform the analysis of the scope of fiduciary duties between attorneys and their clients, as well as between attorneys and their former clients. *Sealed Party v. Sealed Party,* 2006 WL 1207732 at *8 (S.D. Tex. 2006). *See also Nolan v. Foreman,* 665 F.2d 738, 740-43 (5th Cir. 1982); *Two Thirty Nine Joint Venture v. Joe,* 60 S.W.3d 896, 905-908 (Tex. App.—Dallas 2001, *rev'd on other grounds,* 145 S.W.3d 150 (Tex. 2004)); *Arce v. Burrow,* 958 S.W.2d 239, 245 and n. 4 (Tex. App.–Houston [14th Dist.] 1997, *aff'd in part, rev'd in part on other grounds,* 997 S.W.2d 229 (Tex. 1999); *Avila,* 761 S.W.2d at 400.

The following Texas Disciplinary Rules of Professional Conduct are relevant to my opinions:

1. **Rule 1.06: "Conflict of Interest: General Rule"** states in pertinent part that:

"(b) In other situations and except to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person:

> (1) involves a substantially related matter in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm; or

> (2) reasonably appears to be or become adversely limited by the lawyer's or law firm's responsibilities to another client or to a third person or by the lawyer's or law firm's own interests.

\*\*\*

(c) A lawyer may represent a client in the circumstances described in (b) if:

> (1) the lawyer reasonably believes the representation of each client will not be materially affected; and

> (2) each affected or potentially affected client consents to such representation after full disclosure of the existence, nature, implications, and possible adverse consequences of the common representation and the advantages involved, if any.

\*\*\*

(e) If a lawyer has accepted representation in violation of this Rule, or if multiple representation properly accepted becomes improper under this Rule, the lawyer shall promptly withdraw from one or more representations to the extent necessary for any remaining representation not to be in violation of these Rules.

(f) If a lawyer would be prohibited by this Rule from engaging in particular conduct, no other lawyer while a member or associated with that lawyer's firm may engage in that conduct."

Comment 1 to Rule 1.06: "Loyalty is an essential element in the lawyer's relationship to a client. An impermissible conflict of interest may exist before representation is undertaken, in which event the representation should be declined . . . . Under this Rule, any conflict that prevents a particular lawyer from undertaking or continuing a representation of a client also prevents any other lawyer who is or becomes a member of or an associate with that lawyer's firm from doing so. See paragraph (f)."

Comment 7 to Rule 1.06: "A client under some circumstances may consent to representation notwithstanding a conflict or potential conflict. However, as indicated in paragraph (c)(1) [to Rule 1.06], when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, a lawyer involved should not ask for such agreement or provide representation on the basis of the client's consent. When more than one client is involved, the question of conflict must be

resolved as to each client. Moreover, there may be circumstances where it is impossible to make the full disclosure necessary to obtain informed consent. . . ."

Comment 8 to Rule 1.06: "Disclosure and consent are not formalities. Disclosure sufficient for sophisticated clients may not be sufficient to permit less sophisticated clients to provide fully informed consent. While it is not required that the disclosure and consent be in writing, it would be prudent for the lawyer to provide potential dual clients with at least a written summary of the considerations disclosed."

Comment 17 to Rule 1.06: "Raising questions of conflicts of interest is primarily the responsibility of the lawyer undertaking the representation. . . ."

See also other comments to Rule 1.06, including comments 4, 5, and 6.

2. **Rule 1.09: "Conflict of Interest: Former Client"** states in pertinent part that:

(a) "Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:

\*\*\*

(2) if the representation in reasonable probability will involve a violation of Rule 1.05; or

(3) if it is the same or a substantially related matter.

(b) Except to the extent authorized by Rule 1.10, when lawyers are or have become members of or associated with a firm, none of them shall knowingly represent a client if any one of them practicing alone would be prohibited from doing so by paragraph (a)."

\*\*\*

Comment 10 to Rule 1.09: "This Rule is primarily for the protection of clients and its protections can be waived by them. A waiver is effective only if there is consent after disclosure of the relevant circumstances, including the lawyer's past or intended role on behalf of each client, as appropriate. See Comments 7 and 8 to Rule 1.06."

3. **Rule 1.05: "Confidentiality of Information"** states in pertinent part that:

"(b) Except as permitted by paragraphs (c) and (d), or as required by paragraphs (e) and (f), a lawyer shall not knowingly:

(1) Reveal confidential information of a client or a former client to:

(i) a person that the client has instructed is not to receive the information; or

(ii) anyone else, other than the client, the client's representatives, or the members, associates, or employees of the lawyer's firm.

(2)  Use confidential information of a client to the disadvantage of the client unless the client consents after consultations.

(3)  Use confidential information of a former client to the disadvantage of the former client after the representation is concluded unless the former client consents after consultation or the confidential information has become generally known.

(4)  Use privileged information of a client for the advantage of the lawyer or of a third person, unless the client consents after consultation."

## C. TEXAS AND FIFTH CIRCUIT LAW REGARDING CONFLICTS OF INTEREST AND PRESUMPTIONS REGARDING CONFIDENTIAL INFORMATION

Under Texas law, two conclusive presumptions regarding confidential information exist in a conflict of interest situation. Although these presumptions have developed in disqualification settings, they are, in my opinion, equally applicable to the present situation.

First, the Texas Supreme Court has adopted a standard requiring disqualification whenever counsel undertakes representation of an interest that is adverse to that of a former client, as long as the matters embraced in the pending suit are substantially related to the factual matters involved in the previous suit. This strict rule is based on a conclusive presumption that confidences and secrets were imparted by the client to the attorney during the prior representation. This rule has been applied mainly in the context of a single attorney or firm representing two clients with adverse interests. *Phoenix Founders, Inc. v. Marshall,* 887 S.W.2d 831, 833-834 (Tex. 1994). *See also Centerline Industries, Inc. v. Knize,* 894 S.W.2d 874, 876 (Tex. App.–Waco 1995, orig. proceeding) (holding that (1) because the substantial relationship test is concerned with both a lawyer's duty of confidentiality and his duty of loyalty, a lawyer who has given advice in a substantially related matter must be disqualified, whether or not he has gained confidences; and (2) if two matters are substantially related so that Rule 1.09 (a)(3) is brought into play, it should make no difference whether the lawyer gained no confidences or whether all of the confidences gained have been publicly disclosed. At least some Texas appellate courts have also held that once a substantial relationship is found to exist in this setting, there is a conclusive *irrebuttable* presumption that confidences and secrets were imparted to the former attorney. *See Clarke v. Ruffino,* 819 S.W.2d 947, 951 (Tex. App. – Houston [14th Dist.], orig. proceeding.) (citing *Insurance Co. of North America v. Westergren,* 794 S.W.2d 812, 815 (Tex. App.–Corpus Christi 1990, motion to file mandamus overruled.)

Under Texas law, the second presumption that applies in a conflict of interest setting is a conclusive irrebuttable presumption. Once a substantial relationship is shown to exist between [the subject matters of] the prior representation and the present representation, it is presumed that "an attorney who has obtained confidential information shares it with other members of the attorney's firm, because of the interplay among lawyers who practice together." *Phoenix Founders,* 887 S.W.2d at 834. Also, "[t]he attorney's knowledge is imputed by law to every

other attorney in the firm. There is, in effect, an irrebuttable presumption that an attorney in a law firm has access to the confidences of the clients and former clients of other attorneys in the firm." *National Medical Enterprises, Inc. v. Godbey*, 924 S.W.2d 123, 131 (Tex. 1996).

The law of the Fifth Circuit regarding conflicts of interests and presumptions in conflict situations is somewhat different than that followed by Texas state courts, in that the Fifth Circuit has held that national rules governing the conduct of attorneys, for example, the ABA Model Rules of Professional Conduct and the Restatement of Law Governing Lawyers, as well as the Texas Disciplinary Rules of Professional Conduct, are relevant to such considerations. *See, for example, In re Dresser Indus., Inc.*, 972 F.2d 540, 543 (5th Cir. 1992); *In re American Airlines, Inc.*, 972 F.2d 605, 609-610 (5th Cir. 1992), *cert denied*, 113 S.Ct. 1262 (1992). Although federal courts may adopt state and/or ABA rules as their ethical standards, whether and how those rules should be applied remains a question of federal law. *In re American Airlines, Inc.*, 972 F.2d at 610.

*In re American Airlines, Inc.* stands for the following legal propositions in the context of a *former* client complaining about a law firm's conflict of interest in representing a subsequent client:

(1) although the Fifth Circuit had earlier developed its substantial relationship test for disqualification purposes in conflict of interest situations prior to the promulgation of the Texas Disciplinary Rules of Professional Conduct (and Rule 1.09 specifically), there is not a material difference between the Fifth Circuit's substantial relationship test and that provided under Rule 1.09. *Id.* at 617-618;

(2) once it is established that prior representation matters are substantially related to a present case, "the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation." A second irrebuttable presumption will then also apply: "that confidences obtained by the individual lawyer will be shared with the other members of his firm." *Id.* at 614;

(3) The concerns underlying the substantial relationship test cannot be conflated or reduced to only the preservation of a client's confidential information. The second fundamental concern protected by the test is the client's interest in the loyalty of his attorney. *Id.* at 616-621. On this point the court notes: "If courts protect only a client's disclosures to his attorney, and fail to safeguard the attorney-client relationship itself – a relationship which must be one of trust and reliance – they can only undermine the public's confidence in the legal system as a means for adjudicating disputes." *Id.* at 618. And, "[o]ur continued adherence to the substantial relationship test rests on our belief that the ethical prohibition against successive representation cannot be reduced to the protection of client's confidences, . . . Rather, a lawyer's obligation of confidentiality must be seen as part of the lawyer's primary duty of loyalty, a duty that is not exhausted by the preservation of a former client's secrets." *Id.* at 619.

The general rule established in the Fifth Circuit with respect to attorneys' conflicts of interest regarding *current* clients is that, absent exceptional circumstances, a law firm may not sue its own client when it concurrently represents that client in another matter, even when the two matters are unrelated. This clearly prohibits a lawyer from suing its existing client without

that client's consent. *In re Dresser Indus.,* 972 F.2d at 541. *See also Hill v. Hunt,* 2008 WL 4108120 (N.D. Tex. 2008) at *14 (citing ABA Model Rules of Professional Conduct 1.7).

## III.    OPINIONS

My opinions are as follows:

1.    Although I have not reviewed or received the Langley & Banack file regarding its representation of Innovative Concrete in the Winstead Lawsuit, the evidence I have seen in court records indicates that Innovative Concrete was a current client of Langley & Banack in the Winstead Lawsuit, while Langley & Banack was simultaneously representing another party, KB Home Lone Star, L.P., and its affiliated or related entities (hereinafter "KB Home Lone Star, L.P."), in at least the SAHA Lawsuit (later consolidated with the related lawsuit, the Arias Lawsuit, into the Consolidated Lawsuit.) (*See particularly* Section I, parags. 14-17, as well as 24-40). In my opinion, Langley & Banack was prohibited from representing KB Home Lone Star, L.P. in the SAHA Lawsuit (and later in the related Arias Lawsuit and the Consolidated Lawsuit) because such representation was adverse to Innovative Concrete and was a clear and serious breach of fiduciary duty to Innovative Concrete and a conflict of interest based on the law governing the fiduciary duty of lawyers to clients cited above, as well as Texas Disciplinary Rule of Professional Conflict 1.06(b)(1) and (2) and (c)(1) and (2), as well as ABA Model Rule of Professional Conduct 1.7 and *In re Dresser Indus.,* 972 F.2d at 541. *See also Hill v. Hunt,* 2008 WL 4108120 (N.D. Tex. 2008) at *14. I have seen no evidence that Langley & Banack ever sought the consent of Innovative Concrete before commencing its representation of KB Home Lone Star, L.P. in the SAHA Lawsuit or made the kinds of disclosures to Innovative Concrete that the law firm would have had to make in order to attempt to do so. But, in any event, it is my further opinion that no disinterested lawyer could reasonably have believed that Langley & Banack's representation of Innovative Concrete would not be materially affected by its representation of KB Home Lone Star, L.P. in the SAHA Lawsuit given the degree to which Langley & Banack's representation of KB Home Lone Star, L.P. in this lawsuit was substantially related to its representation of Innovative Concrete in the Winstead Lawsuit, and the extent of the adversity to the interests of Innovative Concrete created by the SAHA Lawsuit and Langley & Banack's representation of KB Home Lone Star, L.P. in that lawsuit. *See* particularly Texas Disciplinary Rule of Professional Conduct 1.06(c)(1). Thus, in my opinion, the conflict of interest created by Langley & Banack's representation of KB Home Lone Star, L.P. in the SAHA Lawsuit was unwaivable and unconsentable by Innovative Concrete. Further, because Langley & Banack's representation of KB Home Lone Star, L.P. was in violation of the conflict of interest rules governing the conduct of attorneys in Texas, and a clear and serious breach of fiduciary duty to its then current client, Innovative Concrete, that representation never should have been undertaken. *See, for example,* Texas Disciplinary Rule of Professional Conduct 1.06 (e) and (f). As a result, neither Innovative Concrete nor its insurer, Indian Harbor, should be responsible for any

attorneys' fees of Langley & Banack in the SAHA Lawsuit, Arias Lawsuit, and Consolidated Lawsuit incurred on behalf of KB Home Lone Star, L.P. Nor does KB Home Lone Star, L.P. now have a valid claim for Langley & Banack's attorneys' fees from either Innovative Concrete or Indian Harbor, the latter of which minimally stands in the shoes of, and is in privity with, Innovative Concrete. Further, under the circumstances, attorneys' fees of Langley & Banack incurred in the SAHA Lawsuit, the Arias Lawsuit, and the Consolidated Lawsuit are unreasonable and excessive.

2.     Assuming for the sake of argument that Innovative Concrete should be viewed as a former client rather than as a current client of Langley & Banack at the time that law firm undertook to represent KB Home Lone Star, L.P. in the SAHA Lawsuit and Arias Lawsuit, that fact would not change my ultimate opinion.     Under such circumstances, it would still be my opinion that Langley & Banack was prohibited from representing KB Home Lone Star, L.P. in the SAHA Lawsuit, the Arias Lawsuit, and the Consolidated Lawsuit, and that the law firm's acceptance of such representation was in violation of the conflict of interest rules governing the conduct of attorneys in Texas, and a clear and serious breach of fiduciary duty to its then former client, Innovative Concrete. In light of both the state and federal law cited above, Langley & Banack's representation of KB Home Lone Star, L.P. in all reasonable probability involved a breach of Innovative Concrete's right to confidentiality under Texas Disciplinary Rules of Professional Conduct 1.09 (a)(2) and 1.05(b), as well as under the substantial relationship test adopted by the Fifth Circuit. However, in my opinion, the conflict of interest presented by Langley & Banack's conduct in question ultimately goes to the larger issue of loyalty. Under the Fifth Circuit's substantial relationship test as adopted in *In re American Airlines,* the protection of confidential information is just one part of the fiduciary duty of loyalty so that "[o]ur continued adherence to the substantial relationship test rests on our belief that the ethical prohibition against successive representation cannot be reduced to the protection of client's confidences, . . . Rather, a lawyer's obligation of confidentiality must be seen as part of the lawyer's primary duty of loyalty, a duty that is not exhausted by the preservation of a former client's secrets." *In re American Airlines* at 619. I believe that this is also true under Texas law when looking not only at Texas Disciplinary Rules of Professional Conduct 1.09 (a)(3) and 1.06, comment 1 ("Loyalty is an essential element in the lawyer's relationship to a client"), but also Texas case law governing lawyer's fiduciary duties to their clients, including such duties in conflict of interest contexts. *See Centerline Industries, Inc.,* 894 S.W.2d at 876.     The essential test here regarding loyalty is whether Langley & Banack represented KB Home Lone Star, L.P. in matters adverse to Innovative Concrete that were substantially related to the Winstead Lawsuit in which that law firm represented Innovative Concrete.

3.  If Innovative Concrete were viewed only as a former client of Langley & Banack at the time that firm represented KB Home Lone Star, L.P., it is my further opinion that no disinterested lawyer could reasonably have believed that Langley & Banack could represent KB Home Lone Star, L.P. in the other lawsuits given the degree to which Langley & Banack's representation of KB Home Lone Star, L.P. in those

lawsuits was substantially related to its representation of Innovative Concrete in the Winstead Lawsuit, and the extent of the adversity to the interests of Innovative Concrete created by those other lawsuits and Langley & Banack's representation of KB Home Lone Star, L.P. in those lawsuits. *See* particularly Texas Disciplinary Rules of Professional Conduct 1.09 (a) and comment 10 to that rule, which in turn incorporates Rule 1.06(c)(1) and (2) through comments 7 and 8 to Rule 1.06. Thus, in my opinion, the conflict of interest created by Langley & Banack's representation of KB Home Lone Star, L.P. in the SAHA Lawsuit, the Arias Lawsuit, and the Consolidated Lawsuit was unwaivable and unconsentable by Innovative Concrete regardless of whether Innovative Concrete is considered as a former or current client of Langley & Banack. Further, even under the scenario where Innovative Concrete is viewed only as a former client of Langley & Banack. Langley & Banack's representation of KB Home Lone Star, L.P. was in violation of the conflict of interest rules governing the conduct of attorneys in Texas, and in clear and serious breach of its fiduciary duty to its former client, Innovative Concrete, and thus that representation should never have been undertaken. *See, for example,* Texas Disciplinary Rule of Professional Conduct 1.09 (a)(3). As a result, Langley & Banack is not entitled to recover any attorneys' fees from Innovative Concrete or its insurer, Indian Harbor in the SAHA Lawsuit, Arias Lawsuit, and Consolidated Lawsuit that KB Home Lone Star, L.P. has claimed. Nor does KB Home Lone Star, L.P. now have a valid claim for Langley & Banack's attorneys' fees from either Innovative Concrete or Indian Harbor, the latter of which minimally stands in the shoes of, and is in privity with, Innovative Concrete. Further, under the circumstances, attorneys' fees of Langley & Banack incurred in the SAHA Lawsuit, the Arias Lawsuit, and the Consolidated Lawsuit are unreasonable and excessive.

4. Regardless of whether Innovative Concrete is to be viewed as a former or current client of Langley & Banack, it is my further opinion that Langley & Banack's representation of KB Home Lone Star, L.P. in the SAHA Lawsuit, Arias Lawsuit, and the Consolidated Lawsuit was adverse to Innovative Concrete, and that these matters were and are substantially related to the Winstead Lawsuit, Innovative Concrete's position in the Winstead Lawsuit, and Langley & Banack's representation of Innovative Concrete in that lawsuit. *See generally* Section I, paragraphs 1-18 and 24-40 above. Among other things, in the Winstead Lawsuit, KB Home Lone Star, L.P. sued Innovative Concrete as a third-party defendant, and in that lawsuit Innovative Concrete was defended by Langley & Banack. In the other three lawsuits, Langley & Banack, on KB Home Lone Star, L.P.'s behalf, sued Innovative Concrete as a third-party defendant. Each of the four lawsuits at issue involved residential construction defects in which KB Home Lone Star, L.P. was the builder and contractor of the residences in question and was sued in those capacities. In each of the four lawsuits KB Home Lone Star, L.P. sued Innovative Concrete for its work as a subcontractor in providing concrete and foundation services. In each of the lawsuits, KB Home Lone Star, L.P., also sought to recover from Innovative Concrete (and/or its insurer), on, among other theories, indemnity and contribution, in the event that KB Home was found to be liable to the plaintiffs. And in each of the four lawsuits, KB Home Lone Star, L.P. sought insurance proceeds from Innovative Concrete's liability insurance

policy with Indian Harbor, and, in all likelihood, under the same policy. (*See* Plaintiffs' Original Petition in the Winstead Lawsuit, which states that the residence in question in that lawsuit was constructed between November 2000 and April 2001 and compare to the Indian Harbor policy at issue in the Declaratory Judgment Action described in Section I, paragraph 41 above.)

5. It is my further opinion that Langley & Banack's separate representation of Innovative Concrete in the Innovative Concrete Bankruptcy Proceeding during the period from November 2004 through March 2006, a proceeding in which KB Home Lone Star, L.P. was a creditor, simply exacerbated the conflict of interest situation in which the Langley & Banack attorneys later found themselves with respect to Innovative Concrete, as well as that firm's breaches of fiduciary duty to Innovative Concrete discussed in this section above. *See also* Section I., paragraphs 10-12 and 19-22 above.

6. It is my further opinion that Indian Harbor minimally stands in the shoes of, and is in privity with, Innovative Concrete for the purpose of raising the conflict of interest and breaches of fiduciary duty issues pertaining to Langley & Banack discussed above. In addition, it also appears from the materials I reviewed in the Winstead Lawsuit and the Innovative Bankruptcy Proceeding that Indian Harbor was the liability insurer of Innovative Concrete with respect to the plaintiff's claims in the Winstead Lawsuit. At the very least, Langley & Banack knew that the plaintiffs in that lawsuit were seeking insurance proceeds, and in all likelihood they were seeking such proceeds from Indian Harbor. *See particularly,* Section I., paragraphs 10-12. Thus, it is possible, and perhaps probable, that Indian Harbor was a client of Langley & Banack in the Winstead Lawsuit, particularly since all that was being sought from Innovative Concrete in the Winstead Lawsuit was insurance proceeds because of the Innovative Concrete Bankruptcy proceeding. In my experience, when a party is being sued during the pendency of its bankruptcy and all that is being sought from that party is insurance proceeds, the lawyer defending that party largely takes direction from the insurer as if it were the client. The Texas Supreme Court has recognized that, under certain circumstances, a law firm that represents an insured may also represent the interests of the insurer. *See Unauthorized Practice of Law Committee v. American Home Assurance Company, Inc.,* 261 S.W.3d 24 (Tex. 2008) in which the Texas Supreme Court noted that "[w]e have never held that an insurance defense lawye*r cannot* represent both the insurer and the insured, only that the lawyer *must* represent the insured and protect his interests from compromise by the insurer. And we have noted that 'an insurer's right of control generally includes the authority to make defense decisions *as if it were the client* 'where no conflict of interest exists.'" *Id.* at 42. If an attorney-client relationship was created between Langley & Banack and Indian Harbor by implied or express contract or course of dealing in the Winstead Lawsuit, Indian Harbor would have an additional reason to stand in the same position as Innovative Concrete with respect to the Langley & Banack conflict of interest issues and breaches of fiduciary duty raised in paragraphs 1-4 in this section, particularly since Langley & Banack also knew that Indian Harbor was Innovative Concrete's liability insurer during the pendency of the SAHA Lawsuit, Arias

Lawsuit, and Consolidated Lawsuit, and that KB Home Lone Star, L.P. was making a claim for Langley & Banack's attorneys' fees under Innovative Concrete's liability insurance policy with Indian Harbor for its work in those lawsuits.

7. All of my opinions expressed herein are subject to being provided any additional information or materials to review or consider, including but not limited to Langley & Banack's client files in question.

## IV. ADDITIONAL INFORMATION REQUIRED UNDER FEDERAL RULE OF CIVIL PROCEDURE 26 REGARDING EXPERT TESTIMONY

I have been compensated at the rate of $350.00 as an expert witness in this case for my time in reviewing materials and preparing this report. I have not testified as an expert at trial or by deposition in the last four years. In the last 10 years, I authored the following publication: *"Breach-of-Fiduciary-Duty Claims Against Lawyers on the Rise,"* Texas Lawyer, February 13, 2006. Paul Knisely and I also authored the following paper that was presented at a Texas Trial Lawyer Association Seminar in Santa Fe, New Mexico in early June 2002: *"Legal Malpractice Claims Against the Big Dogs."*

Sincerely,

Tom Prehoditch

# Knisely, Prehoditch & Panzer, P.C.

| Home | Attorneys | Practice Areas | Firm Profile | Contact Us | Disclaimer |

## Thomas P. Prehoditch

512.338.8802 (direct)
512.338.8806 (fax)



### Areas of Practice

Professional Negligence (other than medical malpractice)

Legal Malpractice

Auditor Malpractice

Accountant Malpractice

Fiduciary Litigation

Commercial Litigation

Attorney Fee Disputes

Conflicts of Interest

Legal Ethics

Intellectual Property Litigation

Business Litigation

Business Torts

General Civil Trial and Appellate Practice

### Education and Employment

University of Texas School of Law, 1991
Doctor of Jurisprudence

University of Oregon, 1985
Doctor of Philosophy, Political Science

University of Oregon, 1977
Master of Arts, Political Science

University of Texas at Arlington, 1974
Bachelor of Arts, *with high honors*

Associate with the law firm of Spivey, Grigg, Kelly & Knisely 1991-1997

*The Review of Litigation*, Administrative Editor, 1990-1991



EXHIBIT

A

## Bar Admissions

State of Texas

United States Court of Appeals Fifth Circuit

United States District Court, Northern District of Texas

United States District Court, Southern District of Texas

United States District Court, Western District of Texas

United States District Court, Eastern District of Texas

## Memberships and Professional Associations

State Bar of Texas

Austin Bar Association

Texas Bar Foundation

Texas Trial Lawyers Association

Capital Area Trial Lawyers Association

Member, American Inns of Court, Robert W. Calvert Inn, 1992-1995, 2000-2003

## Awards and Recognitions

Rated "AV" by the Martindale Hubbell organization, one of the oldest rating authorities worldwide. According to Martindale-Hubbell. the "A" represents the highest level of legal ability, and the "V" indicates "Very high" adherence to the Professional Code of Responsibility in conduct, ethics and diligence.

## Articles

"The Voting Rights Act and Judicial Selection Litigation: An Evaluation of Remedial Options", The Review of Litigation, Vol. 11, No. 3, Summer 1992

**Knisely, Prehoditch & Panzer, P.C.**
9020 Capital of Texas Hwy. N | Bldg. 1, Suite 300 | Austin, Texas 78759 | 512.338.8800



## Thomas P. Prehoditch

Member
Knisely, Prehoditch & Panzer, P.C.
Austin, TX U.S.A.
www.kpp-law.com

Phone 512-338-8800

Click Here to Contact

**Peer Rating**
5.0/5.0
AV® Preeminent

**Client Rating**
N/R
Submit a review

AV Peer Review Rated

---

**Experience & Credentials**       Ratings & Reviews

**Practice Areas**

- Professional Malpractice
- Legal Malpractice
- Conflicts of Interest

- Intellectual Property Litigation
- Accountants Malpractice
- Business Litigation

| | |
|---|---|
| **University** | University of Texas, Arlington, B.A., Gov't., with high honors, 1973; University of Oregon, M.A., 1977, Ph.D., Political Science, 1985 |
| **Law School** | University of Texas, J.D., 1991 |
| **Admitted** | 1991; Texas; U.S. Court of Appeals, Fifth Circuit and U.S. District Court, Western, Eastern, Northern and Southern Districts of Texas |
| **Memberships** | Austin Bar Association; State Bar of Texas; Texas Trial Lawyers Association; Texas Bar Foundation; Capital Area Trial Lawyers Association. |
| **Born** | Fort Worth, Texas, April 12, 1952 |
| **Biography** | Member, 1989-1991, Administrative Editor, 1990-1991, The Review of Litigation. Author: "The Voting Rights Act and Judicial Selection Litigation: An Evaluation of Remedial Options", The Review of Litigation, Vol. 11, No. 3, Summer 1992. Member, American Inns of Court, Robert W. Calvert Inn, 1992-1995, 2000-2003. |
| **Reported Cases** | Vinson & Elkins v. Moran, 946 S.W.2d 381 (Tex. App.--Houston 14th Dist., 1997, writ dism'd by agrmt); Burnap v. Linnartz, 914 S.W.2d 142 (Tex.App.--San Antonio, 1995, writ denied); Burnap v. Linnartz, 38 S.W.3d 612 (Tex. App.-San Antonio, 2000, writ dism'd by agrmt.); In Re Legal Econometrics, Inc., 191 B.R. 331 (Bankr. N.D. Tex., 1995). |
| **ISLN** | 901231374 |

**Office Information**

Thomas P. Prehoditch
Knisely, Prehoditch & Panzer, P.C.
9020 Capital of Texas Hwy. N., Bldg. I, Suite 300
Austin, TX 78759



Get Directions